I want you to tell me your name, who you represent, come on up, come on up, and approximately how long your argument will take. Good morning, counsel. Good morning, your honors. Kate Schwartz from the State Appellate Defender's Office on behalf of Lamont Boswell. My argument will take approximately 15 minutes, and I would like to reserve three minutes for rebuttal, please. Very good, Ms. Schwartz. Thank you. Good morning, counsel. Good morning, your honors. Brandon Nemec from the Cook County State Attorney's Office representing the people of the state of Illinois. My argument should take approximately 15 minutes as well. Very good. Thank you. Ms. Schwartz, why don't you begin with your argument. May it please the court, in this appeal from his convictions for possession of a controlled substance, Mr. Boswell raises two claims. If time permits, I will discuss the second issue regarding the trial court's failure to provide Rule 401A admonishments, but I would like to primarily focus today on Mr. Boswell's first claim, that the controlled substances underlying his convictions must be suppressed because they were obtained as the result of an unlawful stop followed by an unlawful frisk. In this case, the officers went to investigate Mr. Boswell after an unknown woman approached them, admitted to them that she is a drug user, and provided them with basic identifying information about the man from whom she had purchased narcotics at some unspecified time. Is the identifying information height, weight, race, is that in the police reports? I believe that may be in the police reports, Your Honor. It did not come out at trial, it did not come out in testimony until the point of trial. At the suppression hearing, the officer merely gave the categories of the descriptors, but I do believe that may have been in the police report. What about the camouflage jacket, was that in the police report or in the? I believe the camouflage jacket was in the police report as well, but I would need to double check and I will do that when I sit down. But ultimately, the fact that the physical description was provided is insufficient to provide reasonable suspicion for the tip or for the stop. Why should we consider the informant to be reliable? We should not consider the informant to be reliable because just like in People v. Reinhart and People v. Henderson, this informant remained effectively anonymous despite the fact that she was providing this tip in person. For one thing, she did not provide any information about herself, be it her name, be it her address, so she could not be held accountable if her tip had turned out to be fake. Adding to that is the fact that just like in Reinhart, the officers did not point to anything here about the informant that made her appear to be reliable to them, anything that they were able to perceive because of the fact that she was standing in front of them. And she admitted that she had been buying drugs from some person. Exactly, Your Honor. So the fact that we do know her source of knowledge might be, that's generally considered to be something that helps the tip, but here the fact that her source of knowledge, that she was a drug user, in a sense certainly takes away from her reliability. And adding to that is the fact that though she says that she had purchased narcotics from this person in the past, there's nothing provided in her tip to help establish that to be true. One would think that if she had actually purchased narcotics from this person before, she could have at least specified what types of drugs this individual sold, how they were packaged, how he went about delivering those to the buyers, perhaps a name or at least a nickname, but none of that types of information was provided. And that goes to the fact that this tip did not include any details regarding the alleged illegality. And that makes this tip very comparable to Florida v. J.L., where the tip was found to be insufficient to support the stop. And although that was a tip that was provided anonymously over the phone, here just like in Reinhart and Henderson, there was nothing about the way that this tip was provided in person that made it any more reliable than an anonymous tip provided over the phone. And so what we're left with here is a bare report lacking in detail and reliability. The tip did not predict any future behavior. It didn't provide any details. And there was nothing about the woman who provided the tip that lent added reliability to the tip on top of the details that were initially provided.  They were investigating a tip that didn't have any reliability to it. And so what they observed was particularly important, because that was essentially what needed to provide reasonable suspicion, was really focused on the observation itself. There really wasn't anything for them to corroborate, though, because all they could corroborate was innocent details, which is all that she provided, his physical description and his location, which was facts that were readily available to the public and that were existing at the time that she provided the tip. Mr. Boswell was only located one block away, and they went immediately there. So the fact that they found a man matching the description a block away is insignificant. And then there was nothing beyond that for them to corroborate. Now, the officers did observe Mr. Boswell engage in one act, which was consistent with innocent activity. According to Officer Pascallo, he saw Mr. Boswell clasp hands with another individual. And according to Officer Gomez, he saw Mr. Boswell exchange money with another individual. But the cases of Pettymore and Ocampo all stand for the proposition that that, in and of itself, is consistent with innocent behavior. Even if Mr. Boswell had exchanged money with another individual, without having seen some other object exchanged, this is consistent with someone paying a friend back, and a hand clasp is certainly consistent with the way that people shake hands or greet one another and say hello. The White Court explained the tip with a corroboration as working on kind of a sliding scale. And it said that if a tip has low reliability, then more information is required to establish reasonable suspicion. Here, the tip had, I would argue, no reliability, and so a great deal more information was required in order to establish reasonable suspicion. Seeing one act which is consistent with innocent behavior doesn't rise to the level of creating the reasonable suspicion that would be necessary. The Yarborough Court also talked about the fact that it's the quality of the corroboration that matters. And according to the Illinois Supreme Court in Thomas, the situation for a stop must be so far from ordinary that any competent officer would be expected to act quickly. Now here, the situation was not so far from ordinary. Two people clasping hands or exchanging money on the street is not that far from ordinary. And what a competent officer would be expected to do is remain in their place, set up a surveillance, watch this person for five minutes. If one or two more of the same type of acts had been seen after that point, then certainly there would have been greater suspicion. Seeing somebody clasp hands three times in five minutes is very different than seeing somebody clasp hands just one time. But here, that's all that occurred was this one hand clasp, and the officers did not act as one would expect a competent officer to do, and thus this did not rise to the level of reasonable suspicion, even taking the tip and the observation together, which is what the State really emphasizes here, that it's the combination of the two. But given the weakness of both, which the State takes some liberty in its brief of when it describes them, it describes the tip as being very specific and accurate, but of course that's only with regard to the innocent details. And it describes the observation on page 16 of its brief as being an eyewitness observation of a hand-to-hand narcotics transaction. But of course the officers were not able to say that that's what they had seen. Overlying all of this, the weakness of the tip and the observation, is the fact that there are these inconsistencies in the officer's testimony, which goes to the very heart of the basis for their stop. The most significant is the fact that both officers here testified that they were the one to witness this hand clasp or the purported hand-to-hand transaction because their partner was the one driving. Obviously, one of the two had to be driving, and it's not beyond the realm of possibility that the driver could have also seen Mr. Boswell engaged in a hand clasp, but Officer Gomez specifically said that he told Officer Pescalo what he had seen prompting Pescalo to turn the car around, whereas Officer Pescalo said, I saw this myself, and Officer Gomez was driving. And then adding to that is the fact that this hand clasp or the hand-to-hand transaction was not included anywhere in the arrest report narrative, which is just a bit incredible considering that that was the basis for the stop. But even if this Court finds that the stop itself was lawful, the frisk is even more clearly unlawful in this case because a frisk requires specific articulable facts that the defendant is, to support a reasonable suspicion, that the defendant was armed or dangerous. In this case, there are two different problems with Officer Pescalo's stated explanation for why he frisked Mr. Boswell. For one thing, he stated that, well, his explanation amounted to a very generalized statement, which essentially amounted to the fact that when there are drugs, there often tends to be guns. And the Rivera Court squarely said that that in and of itself is insufficient, that Terry requires more than a general statement that where there's one type of illegality, there's often guns. That's not particular to that individual defendant. Are the officers consistent in their description of when Mr. Boswell said, I've got blows? Yes, Your Honor. The record is clear from both officers that it was during the course of the frisk that that statement was made. And Officer Gomez testified that what happened was while Officer Pescalo was frisking him, he was also simultaneously questioning him as to whether he had any contraband on him. And that was what prompted Mr. Boswell to make that statement. That was something that the trial court, however, was confused about at the suppression hearing in its factual findings. It found that the statement came before the frisk, which was not consistent with the testimony. Adding to the fact that only a general statement was provided as the explanation, Officer Pescalo wasn't even the one to articulate that generalized statement. He was just responding yes to the prosecutor's leading questions in the suppression hearing. So in other words, the prosecutor said something along the lines of, Officer Pescalo, in your experience, is it true that where drugs and guns tend to go together or that there's a logical inference that a drug dealer might be carrying weapons? And Officer Pescalo simply said yes to a series of leading questions like that. The case of Mario T. establishes that a yes response like this to leading questions is also insufficient to establish specific articulable facts to support a frisk. Adding to the fact that there was no sufficient subjective articulation of a need to frisk Mr. Boswell, there were also no objective facts in the record to support it. This frisk occurred in the middle of the afternoon around 2 to 2.30 p.m. in a commercial area. There were two officers as opposed to just one suspect. He was never described as making any furtive movements or acting in a suspicious way. He was not described as being seen with any bulges on him, and certainly the woman who provided the tip never said anything with regards to him being armed or dangerous. So quite unlike Sorensen and DeLuna, the two cases that the state relies on, there are simply no facts here whether or not Officer Pescalo pointed that to them that could support a basis for having frisked Mr. Boswell. And so because both the stop and the frisk were unlawful, that makes both Mr. Boswell's statement about the blows and the evidence that was subsequently recovered fruits of the poisonous tree. Either the stop or the frisk are sufficient to warrant suppression of this evidence, and Mr. Boswell, pursuant to this issue, asks that his convictions be reversed outright for that reason. Turning quickly to the Rule 401A admonishments, as this Court knows, it's a fundamental right guaranteed to any defendant in a criminal prosecution that he be afforded the right to counsel. That's why Rule 401A exists. It's meant to ensure that when a defendant waives his right to counsel, he does so knowingly and voluntarily, and that's the only way that it becomes effective. The state's argument is that Rule 401A was satisfied here by the Court providing individual admonishments on three separate status hearings spanning nine months. The state does not point to a single case that stands for the proposition that that is a sufficient way to satisfy the rule. And there are several contrary cases saying that those admonishments must be provided at the time of waiver. This argument is also just contrary to the purpose of the rule, which is to allow the defendant to consider the ramifications of his decision. Certainly, Mr. Boswell cannot be expected to have adequately been able to consider the ramifications of his decision when one of his purported admonishments was provided seven months earlier at his arraignment, and also notably one of the admonishments that the state points to was provided about a month and a half after counsel had already withdrawn. Counsel withdrew in this case on October 13th, and it was on December 1st when Mr. Boswell was already representing himself that the state claims that he received the final admonishment. This is ultimately just like Campbell, where no compliance, substantial or otherwise, was provided. And just to note that the error in this case was particularly egregious because Mr. Boswell was subject to and sentenced under an extended term sentencing range. Pursuant to this issue, we respectfully ask that this Court reverse and remand for proper 401A admonishments in a new trial if it does not find a Fourth Amendment violation. Thank you. Thank you. Mr. Nimmick. May it please the Court. While on patrol, Chicago police officers Perscalo and Gomez were approached by a woman who placed her anonymity at risk and potentially implicated herself by informing the officers voluntarily that she had just purchased drugs from the defendant just a block away. How did she put her anonymity at risk when they didn't ask her who she was? By approaching the officers and informing them that she had just purchased drugs from the defendant,  which obviously could have been subject to police investigation or arrest at that point by telling them that she had purchased drugs from the defendant and that she had a drug habit. She also provided a detailed description of the defendant, gave his approximate age, his approximate height, his approximate weight, his skin color, identified a particular item of clothing that he was wearing, his camouflaged jacket. Is the defendant correct that that information was not provided when the hearing was held on the motion to suppress? That information was provided at the motion to suppress and at trial. It was not, however, contained in the police report, Your Honor. Oh, but if I recall the testimony at the motion to suppress hearing, it was the officer said she gave us his height, his approximate age, what he was wearing, but didn't say what those were. Didn't say she said he was 5'10", 180. That's correct, Your Honor. So the testimony is she gave us his height, weight, et cetera, but there is no testimony as to what that information was. That's correct, Your Honor. The particulars, the specificity of the description was not contained in the motion to suppress, but as this Court is well aware, it was, however, brought out on direct at trial, and as this Court is well aware, the Court can look to the record in its entirety in order to substantiate. Again, I don't recall, was it in the police report? Were the details in the police report? No, Your Honor, no. I just checked the police report. It just said that a description was given by the woman, but it did not give the specific details. Did she say she just purchased drugs from him or that she had purchased drugs from him in the past? She said that she had purchased drugs from him in the past. So she wasn't really at any risk because she'd be at risk, according to your theory, if she'd just purchased drugs from him, she probably still had the drugs on her. But if she said, I purchased drugs from him in the past, then, oh, well, it could have been two weeks ago. Yes, Your Honor. The record is unclear as to whether she was actually in possession of drugs at the time. So at what risk was she at? If she was, in fact, in possession of the drugs at the time or had used the drugs. But she did say she just bought the drugs. She said in the past. Right. That's correct, Your Honor. Thank you. She does go on to, however, give the location of the defendant. Counsel, you have told this Court that she put herself at risk, and I'm just trying to figure out what risk. And you've answered the question. Thank you. Yes, Your Honor. And she goes on to indicate that the defendant is currently dealing drugs. She describes the criminal behavior that he's engaged in, informing the officers that he is at the corner of 43rd and Cottage Grove, just a block away from where she was, indicating that she possibly could have been interacting with him. 43rd and Cottage Grove? Probably a lot of black men in that group. At 43rd and Cottage Grove, yes. And where she spoke to the officers, she was at 42nd and Cottage Grove, just a block away. Did describe the article of clothing that he was wearing, his camouflage jacket. The officers immediately proceed after talking to the woman. They proceed to the corner of 43rd and Cottage Grove. On the way there, they observe firsthand what they perceive to be a hand-to-hand drug transaction. Officer Pascallo? Yes, sir. She just looked at the police report. Is the camouflage jacket reflected in the police report? It is not, Your Honor. There are no particulars in the police report. However, as I stated, it was generally brought out on the motion to suppress, but brought out in detail at trial. You suggested that we look at the entire record. Your opponent maintains that the officer's testimony is a bit inconsistent. Do you agree with this? There are what I consider to be very, very minor inconsistencies, such as who was driving the car at the time. That's minor? Yes, Your Honor. When you put it all together, who was driving? Who was driving the car, whether they were outside of the car at the time. Right. Were they outside or inside? I mean, when I look at the whole record, where do I place the officers? Inside the car or outside the car? Officer Pascallo indicates that they're outside of the car. Officer Gomez, then at trial, indicates that they're inside of the car at the time. So they're not disindicated. Are they inside or outside? Well, there are inconsistencies as to that particular minor fact. Their observations as to what they observed when they actually made the stop are a little different, too, aren't they? One said he saw a hand-to-hand transaction. The other, Gomez, says he saw money passed. So who do I believe? Was it? Officer Pascallo indicates that he saw the hand-to-hand clasp that he believed to be an exchange of narcotics. People do shake hands, though. It's not illegal activity, is it? Certainly not, Your Honor. But, again, coupled with the fact that they had just spoken to a woman who indicated that the defendant was, in fact, dealing drugs, described with particularity that he was on the street corner dealing drugs in public, and then when the officers immediately arrive, right after speaking to the woman, they see what appears to be a drug transaction. Therefore, coupled together, it substantiates a reasonable suspicion in the officer's mind, due to their substantial experience, both veteran Chicago police officers. Let's say that shaking hands and Officer Gomez says, I saw money being exchanged. Let's say that's enough for them to walk up to Mr. Boswell. It's not enough to frisk him, right? So the court, of course, can consider the officer's subjective belief as he approaches the defendant, and he does testify, Officer Pascallo. Other than the general statement, in my experience, guns and drugs go together, what else is there? He testifies that, in the preliminary part of the motion to suppress, he testifies that he has been, Officer Pascallo has been assigned to the 2nd District Tactical Unit for 14 years. And in his experience there, he knows that that is an area of high gang violence, high crime, high narcotics activity. And in this case, he's investigating. I mean, those generalities, his experience and his belief that guns and drugs go together, then would justify him or any other officer in that neighborhood frisking everybody that they approach. Yes, Your Honor. They could frisk everybody. Right. But he doesn't make that sweeping generality that the officers do in Mario T. and in Rivera. He doesn't make the sweeping generality that any time he's in a high crime area, that he conducts a pat-down when he conducts a terry stop. What he does say is that he was in the midst of investigating illegal drug activity. He does make the reasonable inference that where there is drug activity, there are often guns, based on his experience. And then goes on to say that it was his belief at the time that he approached the defendant that the defendant was armed. But based on what? Give me an objective fact other than his experience and his belief that generally guns and drugs go together. What other objective facts are there in the record to show that he had a subjective belief that this particular individual was armed? The fact that he was in the midst of an investigation of drug activity and that he had actually witnessed what he appeared to be drug activity, just like the officer did in People v. DeLuna, where this court ruled that an officer conducting an investigation, a drug investigation, watched an individual place a kilo of cocaine into his pants and walk up to a known drug house. And the officer was justified in that case, had a reasonable fear for his safety, based on his experience and his subjective belief at the time of the frisk that he did in fact fear for his safety. He testified explicitly that he did not see any guns. He was not aware of any guns in the individual's car or on his person. But just that he, at that specific place, at that specific time, did have a fear for his safety and therefore the court found that his frisk was justified. This isn't exactly the same, though. Nobody saw any drugs. Nobody saw anybody stuffing anything into their pants or exchanging any drugs. Nothing like that. They saw two guys shaking hands. And if this sold money? Officer Gomez did see money. The officer said that he did not. However, both officers testified extensively about their substantial experience in having witnessed hundreds of these hand-to-hand drug transactions over the course of their time investigating narcotics activity. They knew what they saw there was not the casual shake of hands. It was not friends greeting one another. What they saw was a man walk up, quickly clasp hands with another man, and briskly walk away. Your colleague has suggested that their case might have been better if they had, instead of dealing with him immediately, just parked the car a couple feet away, watched him for a while, see what else was going on. They didn't do that. Of course, it would have been ideal if the defendant had been waving around what appeared to be a bag of cocaine or something to that effect. They didn't see any of that. They didn't see any of that. But what they did is they received information from an anonymous person, which immediately proved to be reliable, not only in the description of the defendant, but then in the perceived drug activity that they saw that the informant had just described to them and said that that individual was dealing drugs on the street corner. They immediately go to that street corner and they see what appears to be a hand-to-hand drug transaction. And based on their reasonable suspicion, they were justified in conducting a stop at the defendant. And based on Officer Pescalo's substantial experience in working in a high-crime area, based on the fact that he was investigating drug activity and actually saw what appeared to him to be drug activity and his subjective belief that he feared for his safety on that afternoon, he was justified in conducting a pat-down frisk for officer safety. The frisk did not go beyond a protective pat-down. And of course, during the course of that pat-down, where the frisk was justified and the pat-down was justified, during the course of that pat-down, the officer asks a question to the defendant, do you have weapons or contraband on you? Defendant responds, I have one blow. The officer immediately knows that that's a street term for heroin, therefore giving him probable cause for arrest and probable cause for a search incident to arrest, recovering suspect heroin and 20 codeine pills. And moving on to Issue 2, Your Honors, as this Court is well aware, in order to effectuate a knowing and intelligent waiver of counsel, the trial court must substantially comply with 401A admonishments prior to allowing the defendant to proceed pro se. And the Court did so here. Substantial compliance does not require a strict word-for-word, verbatim reading of the 401A admonishments into the record. One of the required admonishments is to make sure that the defendant understands the charges against him. Yes, Your Honor. And what the trial court here did was ask the defendant to tell her, what are the charges against you? And he fumbled a little bit and then the trial judge said, well, you don't know what the charges are against you. Isn't that backwards? However, the Court did inform the defendant at arraignment, of course, that he was charged with possession of a controlled substance. And there's an indication in his pro se motion to suppress that he filed on September 1st that he was in possession of the preliminary hearing transcripts. And in his own pro se motion, in his own writing, in his own words, he lays out search and seizure arguments, suppression of evidence arguments. He knows that he's charged with a narcotics offense. Well, is there anything in 401A that allows it to be serial over the course of several different court events? Not expressly in Rule 401A. However, for substantial requirements, for substantial compliance, it only requires that the court impart upon the defendant the ‑‑ So if they string it out, the court strings it out one part at a time over a series of, say, three or four court events. In the meantime, the defendant, now pro se, is making decisions, is preparing documents based on a piece of the information that he's required to have instead of all of the information he's required to have and entitled to have. Because I take it you would agree that 401A is not aspirational. It is a mandate. Yes, Your Honor. So isn't that a catch-22 for the defendant? Well, in order for him to make his waiver, all that is required is that it is knowing and intelligent. And in order to substantially comply with the 401A admonishments, the trial court is only required to impart upon the defendant largely what is specified in the rule. It's not required to read verbatim, word for word, all at one hearing contemporaneously with the defendant's waiver. The Supreme Court has held that in people's hands. It's over a period of months. It's okay. On a case-by-case basis, the court can examine the entirety. Can you show me a case that says that? There is not a case on point factually with this, Your Honor. However, the defendant was given the nature of the charges against him at his arraignment on March 24th. He was given the minimum and maximum sentence that he faced based on his extendable sentencing range of one to six years based on his six prior drug felonies and was also advised that he had a right to an attorney on December 1st, 2011. The trial court said to him, either you represent yourself or the public defender will represent you. It's your right. You choose. So it's your position or the State's position that over a period of time, the State can comply with Supreme Court 401 if they provide the defendant with the admonishments over a period of time? Yes, Your Honor. Yes, Your Honor, in order to merely substantially comply with the requirements. And what if, say, after the first time, the defendant, not aware of the rest of the story that hasn't been told to him yet, files some really bonehead motion that totally blows it? Isn't there something wrong with this sort of serial stringing out of the admonitions that puts the defendant in a position of perhaps making a critical mistake? Your Honor, it's certainly not perfect in the record here. It's certainly not strict compliance. However, there is substantial compliance here. Isn't the rule designed to prevent the defendant, who is now going pro se, from making assumptions or mistakes because he doesn't know what he's up against? Yes, Your Honor, of course. So if you only know half of what you're up against and then you find out another quarter of it and then you find out another quarter of it over a period of months, that's okay with the State? Yes, Your Honor. And here there's clear indication, not only in the motion to suppress, but in the defendant's own pro se motion to appeal reversal that was filed on June 9th of 2012. And in that document he indicates that he sheds light on the dispute. It's in C-147 of the record. He sheds light on the dispute between himself and the public defender that after the public defender had argued his motion to suppress and the motion was denied and then again argued a motion to reconsider and that was denied, he wanted to file his own pro se motion to suppress and have it argued. But he wanted the public defender to argue it on his behalf. And that was where the dispute arose between the public defender and defendant that the court was trying to play intermediary to, in essence. And he says in his pro se motion to appeal for reversal, the public defender would not defend me in this motion and I was told that if I wanted to hear the motion, I would have to do it pro se. And then he goes on to say, the law says that if I cannot afford a lawyer, one will be appointed to you. The same admonishment that he was given. And finally goes on to say, in October of 2011, the public defender came in the back to the lockup and told me if I wanted him to defend me to call him. So clearly the defendant not only knows the nature of the charges against him, not only knows the one to six year sentencing range, but also, yes, Your Honor. I think my question isn't what the defendant knew. It's what the judge did. Whether or not the State's position is the judge can substantially, in your words, substantially comply with the rule by stringing out the admonitions over a period of time. That's what I'm trying to get at. Yes, Your Honor. Yes, that is the people's position, is that you can't string these out over time. And especially based on the entirety of the record here, there's a clear indication that the defendant did make a voluntary, knowing, and intelligent waiver. He had appointed counsel. He knew the nature of the charges against him. He knew the sentencing range that he was facing. And clearly knew, based on his own words, in his own writing, knew that he had the right to have the public defender reappointed for him as the court admonished him. And for these reasons, yes, Your Honor. Proceed, counsel. Proceed. For these reasons and for those reasons stated in our brief, we ask that you affirm defendant's convictions for possession of a controlled substance. Thank you, Mr. Newman. Thank you. Ms. Schwartz. Some brief rebuttals. I'll be very brief. I just want to clarify that with regards to the amount of what was said at the actual time when the defendant waived his right to counsel, this is exactly what was said. That's fine. You are going to be held to the same standard as these two. You are not a licensed lawyer. Your motion is already stricken. We have litigated it. We are setting it for jury. December 1st for jury trial, Mr. Boswell, you will be representing yourself. The judge actually did not even ask the defendant to explain to her what the charges were. And on the next date when he was already representing himself and explained that he had asked for the public defender as co-counsel, she said, I will not have co-counsel. It's either they represent you or you represent yourself. It's your right. You choose. And that is the full extent of the admonishments, if you want to call them that, that were given at that time. So was there substantial compliance? No, Your Honor. There was not substantial compliance, certainly not on those dates and not by way of stringing it out across a span of nine months. And as Your Honor said, certainly the question here is whether the court did what it was supposed to do. But I would argue even if the question is whether the defendant actually knew his rights or not, pointing to the post-trial motion is irrelevant. Because if he knew his rights after trial was over, that doesn't mean that he knew his rights going into his trial. And that is his right. Quickly, just a couple points with regard to the stop. The State says that it proved to be reliable, the tip, because they saw a hand-to-hand transaction. I just want to point out that the tip did not include a detail that the way that this dealer was delivering drugs to buyers was via a hand-to-hand transaction. And that's certainly not the only way that dealers deliver drugs to buyers. So we can't even really say that seeing a hand clasp, even if it was perceived as a hand-to-hand transaction, that didn't really do anything to actually corroborate the tip because there was no detail provided about how the drugs were being delivered. There was some question about whether or not the informant had specified that she purchased drugs earlier that day. And on page E8 in the record, it specified that the officer was asked that very question. And he said no, she did not specify that she purchased drugs earlier that day. And then with regard to the frisk, the State said that this was not a sweeping generalization like in Mario T. and Rivera. I just wanted to point out that in Mario T., what the officer answered yes to was the prosecutor's question, did you fear for your safety during the frisk? And he said yes. And I think that's arguably an even stronger case for a frisk than what we have here because at least the officer there said yes, I was in fear. There was not even any articulation here by Officer Perscalo ever that he actually feared for his safety. And with regard to the comparison to DeLuna, finally, I just want to point out that there, the officer saw what he perceived as a kilo of cocaine, which is a very large amount of drugs. And that is, it would be much more likely to infer that somebody has a weapon to protect a very large amount of drugs like that. Also there, the defendant had knocked on the door of the same apartment where the officers were executing a search warrant for drugs. So they knew that this person was coming to engage with somebody who they had probable cause to believe had drugs. Also, the defendant there lied to the officer about how he had arrived there. He said he had arrived by public transportation when the officer actually saw him arrive by car. And they saw a bulge under the defendant's shirt. There were four specific things there within the record that could be pointed to to justify a reasonable suspicion for the frisk. And here there was absolutely nothing. For all of the reasons that we've discussed, we ask this Court to reverse Mr. Boswell's convictions. Thank you very much. Ms. Schwartz, Mr. Nimmick, I want to compliment you on your arguments and your briefs. This case will be taken under advisement, and this Court stands in recess.